IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARI C. EMMONS,<br><br>             Plaintiff,<br><br>   v.<br><br>JO ANNE B. BARNHART,<br>Commissioner of Social Security,<br><br>             Defendant.<br>_____/ | No. C-05-1959 EDL<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REMANDING CASE** |

**I.     INTRODUCTION**

On July 13, 2001, Plaintiff Mari C. Emmons applied for Disability Insurance benefits and Supplemental Security Income benefits under Title II of the Social Security Act based on post-traumatic stress disorder, depression, anxiety and pain in her back, hips, knee and wrist. Administrative Record ("AR") at 95-98. The Social Security Administration ("SSA") denied her application on October 18, 2001. AR at 47-50. Plaintiff appealed the denial of benefits and the SSA denied her appeal on reconsideration on March 21, 2002. AR at 54-58. Following the denial of her appeal, Plaintiff requested a hearing with an administrative law judge, which started on February 25, 2003. AR at 59; 68.

After the February 25, 2003 hearing, further psychological testing and a further hearing on January 8, 2004, administrative law judge Alan K. Goldhammer issued an unfavorable decision on February 10, 2004. AR at 19-35. The ALJ found that although Plaintiff had a severe mental impairment, it did not meet or equal the impairments listed in the Social Security regulations and she retained the residual functional capacity to perform her past relevant work or, alternatively, was not disabled pursuant to the Social Security Medical-Vocational guidelines. The SSA Appeals Council

denied Plaintiff's request for review on April 12, 2005, making the ALJ's decision final. AR at 6-8.

On May 12, 2005, Plaintiff filed this suit in federal court. In moving for summary judgment, Plaintiff contends that: (1) the ALJ did not provide adequate reasons for rejecting a medical advisor's opinion that Plaintiff's condition equals Medical Listing 12.08 (Personality Disorders); (2) the ALJ erred in his determination that Plaintiff was not disabled because she was able to perform past relevant work; and (3) the ALJ erred in his determination that Plaintiff was not disabled because she was able to perform other work in the national economy based on the medical-vocational guidelines. Defendant opposed Plaintiff's motion and filed a cross-motion for summary judgment arguing that the ALJ's decision is supported by substantial evidence and free of legal error.

## II.   STANDARD OF REVIEW

The district court reviews the findings of fact in the final decision to determine whether they are supported by substantial evidence in the whole record and not based on legal error. 42 U.S.C. § 405(g); Desrosiers v. Secretary of H.H.S., 840 F.2d 573, 575-76 (9th Cir. 1988). A proposition supported by substantial evidence is one that a reasonable mind might accept as adequate to support a conclusion. Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997); see also Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997) ("Substantial evidence is more than a scintilla, but less than a preponderance.").

The court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Jamerson, 112 F.3d at 1066 (quoting Magallenes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1997)). If "the evidence is susceptible to more than one rational interpretation," the Commissioner's decision should be upheld. Sandgathe, 108 F.3d at 980.

## III.   SUMMARY OF EVIDENCE BEFORE ALJ

### A. Plaintiff's Testimony

At the time of the initial hearing, Plaintiff was 46 years old. AR at 447. She had received her General Education Degree and completed some training in office technology and word processing; her most recent training was in 1991. AR at 448. Plaintiff has not worked since 2001.

AR at 450, 455.  Prior to 2001, Plaintiff worked in a variety of temporary jobs, including as a warehouse packager, retail stock clerk, quality control person, housekeeper, mail sorter and desk clerk.  AR at 449-455.  Plaintiff testified that she preferred working in temporary jobs.  AR at 454.  After working for a couple of months, Plaintiff would start to feel tired and would eventually sleep through the night and into the next afternoon, thereby missing work.  AR at 497.

Plaintiff does her own shopping and cooking.  AR at 457-58.  She spends time socializing with her friends, reading and going to Bible study.  AR at 458-59, 481.  Plaintiff has never been married, has no children, and at the time of the hearing, she testified that she was living in a rented room.  AR at 447.

Since 1999, Plaintiff had been living in shelters for most of the time, but had been asked to leave at least three times.  AR at 502, 511.  Plaintiff has had trouble getting along with others after she was allegedly assaulted by a neighbor and arrested by the Oakland police in 1998, although she has been getting better.  AR at 464-66.  Also in 1998, Plaintiff was allegedly assaulted by another neighbor and then arrested by the police.  AR at 468-69.  There is "never a day or a moment" that Plaintiff does not think about these events and sometimes she will just stand frozen in one place while she thinks about it.  AR at 474.  She is distrustful of the police.  AR at 503.

Plaintiff testified that she feels the same as she did in 1998, but that "how bad or how much I hurt depends on how active I am."  AR at 455-56.  The pain can be anywhere from her neck down and that her knees "are the worst."  AR at 456.  She cannot do as much lifting, carrying and bending as she was once able to do.  AR at 477-78.  Her hands get weak pretty fast.  AR at 478.  When she stands still, she feels like her back is giving out and the pain radiates down her leg.  AR at 478-79.  She has trouble walking up an incline.  AR at 479.  She rarely reads anything straight through, primarily because "there's always something in it that reminds me of the police."  AR at 481.  She has heard popping sounds, like gunfire, in her head.  AR at 480.

After the police incidents in 1998, Plaintiff's symptoms "really started to set in real bad," so she applied for disability benefits.  AR at 472.  On most nights, Plaintiff has trouble sleeping.  AR at 463.  She has difficulty concentrating, "except when it comes to police stuff," which she can remember "like it happened yesterday."  AR at 475.  She is scared to be in a dark room.  AR at 475.

3

### B. Relevant Medical Evidence

#### 1. Alameda County Department of Behavioral Health Care

Dr. C.J. Meyers, on behalf of the Alameda County Department of Behavioral Health Care, is an examining physician who saw Plaintiff in jail in Oakland, California on April 27, 1998, five days after she was charged with being drunk in public. AR at 206. Dr. Meyers described her as a "sturdy, well-nourished woman who is oriented and coherently intelligent, but garrulous, histrionic, self-righteous, verbally hostile and gratuitously foul-mouthed." Id. Dr. Meyers also noted that although Plaintiff had been sober for at least four days, "she still has the manner of a belligerent, controlling, irritable, recalcitrant drunk." Id. According to Dr. Meyers, Plaintiff claimed not to be mentally ill and he suggested that "the relative tranquility of jail may be a good thing for her." Id. Dr. Meyers diagnosed Plaintiff with alcohol abuse and personality disorder with paranoid and histrionic traits. Id.

#### 2. Berkeley Mental Health

Dr. Irene Raby, an examining physician, saw Plaintiff on August 31, 2000 at the Berkeley Mental Health Center. AR at 230-32. Plaintiff was referred there by the Dwight Way Homeless Shelter due to anger, difficulty sleeping and occasional shaking. Id. The treatment notes show that Plaintiff reported being diagnosed with Post-Traumatic Stress Disorder in December 1999 by Dr. Hicks of the Phoenix Program in Richmond, California, and with anxiety disorder in October of 1999 at Highland Hospital. Id. Plaintiff reported thinking constantly about the 1998 assault incidents. Id. Plaintiff claimed to be taking Paxil for a short time, and her mental status was reported as "anxious/hostile." Id.

#### 3. Dr. Morey A. Weingarten, M.D.

Dr. Morey Weingarten, an state agency consultative psychiatrist, examined Plaintiff on August 30, 2001. AR at 233. Plaintiff claimed that insomnia, anxiety and an inability to concentrate precluded her from working. AR at 234. She also stated that "there will always be a problem" with regard to the injuries she sustained during the alleged March 1998 attack on her, and that the police were plotting against her. AR at 233-234. Dr. Weingarten found that Plaintiff's demeanor was not

4

1  consistent with her reported symptoms, and that although Plaintiff was "very preoccupied with her
2  alleged mistreatment [by police]" and  "presented as 'aggrieved'" there were "no other notable
3  psychological symptoms or problems," and "no evidence of any notable cognitive impairment
4  except for her reported short-term memory difficulties." AR at 235. Dr. Weingarten found "no
5  impairment of her pace, concentration or persistence," and that "she was able to understand,
6  remember and carry out instructions." Id. Dr. Weingarten concluded that "based on [Plaintiff's]
7  current presentation, there is no evidence of a psychological process that would preclude her from
8  dealing with typical workplace demands, including interpersonal interactions." Id. Further, she
9  stated that "there is no evident psychiatric diagnosis" and "no evident pain behavior during this
10 evaluation." Id.

### 4. Dr. Sokley Khoi, Ph.D.

Dr. Khoi is a state agency consultative physician who examined Plaintiff on April 14, 2003 in Oakland, pursuant to the order of the ALJ. AR at 393. Dr. Khoi noted that Plaintiff did not appear distraught or distressed when discussing the 1998 incidents that allegedly led to her anxiety and sleep disorder. Plaintiff reported that her daily activities include "running errands, socializing with friends, going out to eat at restaurants or shelters, attending doctors' appointments, watching television, reading, listening to music, and napping during the day." Id. The mental status examination showed "no overt signs of psychosis." AR at 395. Dr. Khoi also administered the following tests: Wechsler Adult Intelligence Scale-III (WAIS-3); Wechsler Memory Scale-III (WMS-3): Selected Subtests; Bender-Gestalt Test; and Rey 15-Item Memory Test-II.

Plaintiff scored "average" or "within normal limits" on nearly every category of every test, with the exception of a "high average" score on the digit-span subtest of the WAIS-3 (measuring attention/concentration) and a "low average" score on the digit symbol-coding subtest of the WAIS-3 (measuring psychomotor speed/attention). AR at 395. Dr. Khoi noted that Plaintiff was "cooperative and appeared to put forth good effort on testing." Id. Dr. Khoi found "no objective evidence of PTSD or other severe psychiatric disorder," and stated that "it is possible that the claimant's difficulties are characterological in nature." AR at 396. Dr. Khoi concluded that "from a strictly cognitive and emotional standpoint, the claimant is not likely to have difficulty performing

5

1 adequately in the workplace," and that she has "the ability to carry out simple job instructions, adapt
2 to changes in a job routine, maintain adequate pace, and withstand the stress of a routine workday."
3 Id. Dr. Khoi also noted that Plaintiff's "ability to interact effectively with co-workers, supervisors,
4 or the public on a regular basis may be mildly impaired." Id.; AR at 397-98.

### 5. Dr. Faith Tobias, Ph.D.

On July 28, 2003, Dr. Tobias, a state agency consultative physician, examined Plaintiff pursuant to the ALJ's order. AR at 404-14. Dr. Tobias performed the following tests: Bender-Gestalt Test; Minnesota Multiphasic Personality Inventory-2nd Edition (MMPI-2); Rey 15-Item Memory Test-II; Rorschach Inkblot Test; and Trail-Making Test: Parts A & B. Dr. Tobias noted that "during formal testing the claimant was polite, cooperative and put forth good effort." AR at 410. Plaintiff performed above-average and within normal limits on the two parts of the Trail-Making Test, respectively, and within normal limits on tests measuring both general intelligence and memory. AR at 413. Dr. Tobias indicated that Plaintiff had slight to moderate impairment in interacting with the public, supervisors, and co-workers, slight impairment in responding to work pressures appropriately, and slight to moderate impairment in responding to changes in a routine work setting. AR at 404.

After personality testing, Dr. Tobias found that "persons with similar profiles [to Plaintiff] may have a paranoid predisposition, and are often self-centered and narcissistic," and they "may also report chronic, but not debilitating physical complaints." AR at 411. The results of the Rorschach Inkblot test showed that quantitatively, Plaintiff's results "are considered invalid, due to her limited responsiveness," but that qualitatively, Plaintiff's responses suggested a high degree of egocentricity and that although her responses contained cooperative activity, "this was present mostly for male figures, suggesting possible difficulty in the claimant's ability to relate to other women in an intimate or cooperative fashion." Id. Dr. Tobias found that "when emotional content was present, the claimant's percepts suggested underlying depressive affect," but overall, Plaintiff's responses did not indicate current major mood disorder or psychotic process. AR at 412. Rather, her responses suggested a personality disorder with "mixed paranoid, histrionic, and narcissistic traits." AR at 411-12. Like Dr. Khoi, Dr. Tobias found Plaintiff's current difficulty to be "characterological in

6

1  nature," and also that strong emotions may distort her perception. Id. Dr. Tobias noted that if
2  Plaintiff were to demonstrate "more frankly delusional ideation" in the future, "a diagnosis of
3  Delusional Disorder should be considered." AR at 412. Dr. Tobias stated that there was no
4  indication of posttraumatic stress disorder, but rather that Plaintiff's symptoms seemed to be more
5  consistent with depression. AR at 413. Although Plaintiff did not exhibit signs of mood disorder,
6  Dr. Tobias felt that "if her mood symptoms become more pronounced, the possibility of Bipolar II
7  Disorder should be further evaluated." Id. Dr. Tobias found no suggestion of significant overall
8  cognitive impairment. AR at 413.

### C. Medical Expert

Dr. Irwin Shapiro, a state agency non-examining medical advisor, testified as a medical expert at the ALJ's request at both of Plaintiff's hearings. At the initial hearing, Dr. Shapiro testified that because Plaintiff had never been sufficiently tested, there was insufficient evidence in the record to make a determination as to what impairments, if any, Plaintiff exhibited. AR at 485. Dr. Shapiro was concerned that "there is some problem that hasn't been uncovered." AR at 485-86. However, he conceded that Plaintiff's impairments likely establish Listing 12.08, as stated by Dr. Meyers after his examination of Plaintiff in jail. AR at 486. He stated that he "didn't think there's a complete absence of pathology." AR at 487. In addition, Dr. Shapiro stated that Plaintiff "glosses over psychological problems." AR at 486. Dr. Shapiro recommended that Plaintiff undergo projected psychological testing and testified that if the projected tests were negative, then he would have to probably agree with Dr. Weingarten that there was no serious pathology. AR at 487. If the projected tests were positive, Dr. Shapiro would agree with Dr. Meyers that Plaintiff meets Medical Listing 12.08 with paranoia features. AR at 488.

At the second hearing, Dr. Shapiro testified that the results of the recent psychological evaluations by Drs. Khoi and Tobias go "along with the diagnosis of the 12.08 personality disorder." AR at 515. The ALJ asked Dr. Shapiro whether the record supports a listing level impairment under Medical Listing 12.08. AR at 516. Dr. Shapiro responded that: "Well, I think it might -- technically, it doesn't meet the listing, but I think it equals the listing." AR at 516. He further testified that Plaintiff has a marked problem in maintaining social functioning and that she would

7

have trouble with supervisors or punching a clock. AR at 516, 521. He testified that he believed that she would not be persistent in coming to work, but that she would not have any problem in daily living. AR at 517. Dr. Shapiro testified that Plaintiff's testimony that she gets too tired to work after a couple of months on a job is not consistent with a personality disorder. AR at 519. He was concerned, however, about the possible combination of alcohol and medications. AR at 519. Dr. Shapiro believed that Plaintiff has minimized her alcohol use, but that there was no evidence of excessive use. AR st 520-21.

**IV.      DISCUSSION**

      **A. The ALJ's determination**

To qualify for disability insurance benefits, Plaintiff must demonstrate that she is unable to engage in substantial gainful activity due to the effect of a medically-determinable physical or mental impairment, which is expected to result in death or last for a continuous period of at least twelve months. See 42 U.S.C. § 423(d)(1)(A). The SSA uses a five-step sequential evaluation process to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; see also Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987). First, the SSA determines whether the claimant is engaged in substantial gainful activity. See 20 C.F.R. § 404.1520(b). If the claimant is not engaged in substantial gainful activity, the SSA proceeds to step two to determine whether the claimant has a medically severe impairment or combination of impairments. See 20 C.F.R. § 404.1520(c). If the claimant has a severe impairment, the SSA proceeds to step three to "determine whether the impairment is equivalent to one of a number of listed impairments ("listings") that the Secretary acknowledges are so severe as to preclude substantial gainful activity." Bowen, 482 U.S. at 141; see also 20 C.F.R. § 404.1520(d). The SSA presumes that a claimant is disabled if her impairment meets or equals one of the listings. Id.

If the claimant's impairment does not meet or equal one of the listings, the SSA proceeds to step four to determine the claimant's residual functional capacity, which is then used to decide whether the claimant's impairment "prevents [her] from performing work [she] has performed in the past." See 20 C.F.R. § 404.1520(e). The SSA considers the claimant not disabled if she is able to perform her past work. Id. If the claimant cannot perform her past work, the SSA proceeds to step

five to determine whether the claimant can perform other work in the national economy, considering her age, education, and work experience. See 20 C.F.R. § 404.1520(f). If the claimant cannot perform other work, the SSA finds her disabled. See 20 C.F.R. § 404.1520(f)(1).

Here, at step one, the ALJ found that although the record showed that Plaintiff worked in 2000 and 2001, she did not earn amounts at a substantial level and therefore did not perform substantial gainful activity at any time relevant to her claim for benefits. AR at 23. At step two, the ALJ found that the medical evidence showed that Plaintiff "suffers from a Personality Disorder and intermittent substance abuse." AR at 24. The ALJ concluded that these impairments were severe within the meaning of the Social Security regulations. Id.

At step three, the ALJ concluded that Plaintiff's impairments did not meet or medically equal any of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. AR at 24. In particular, the ALJ found no indication from the record that Plaintiff met or equaled Listing 12.08, "the only Listing that [the ALJ found] applicable to this case." AR at 24. Citing Dr. Shapiro's testimony, the ALJ found that "claimant's activities of daily living were not impaired," and her ability to function socially was likewise not "markedly impaired." AR at 24. Further, the ALJ stated that Dr. Shapiro found Plaintiff's concentration, persistence, and pace to be "no more than slightly impaired" and finally that Dr. Shapiro "did not find the 'repeated' episodes of decompensation that Listing 12.08 'B' would require." Id. The ALJ also noted that Dr. Shapiro's testimony was "somewhat supported" by the results of the consultative evaluation performed by Dr.Tobias, who found a "moderate to marked" level of impairment only in Plaintiff's ability to get along with the public, coworkers, and superiors. AR at 413. In all other categories, Dr. Tobias found Plaintiff to have no impairment or just a slight or slight to moderate impairment. AR at 24. The ALJ found that Dr. Tobias's assessment of Plaintiff's functional capacity was consistent with Dr. Shapiro's testimony in that Plaintiff fell short of the criteria in Listing 12.08, particularly with respect to the section "B" requirements. Id.

To proceed with the remaining steps in the evaluation process, the ALJ made a determination as to Plaintiff's Residual Functional Capacity ("RFC"). The ALJ noted that it was Dr. Weingarten, a state agency consultative psychiatrist, who reported Plaintiff's complaints that her

9

difficulties began in March 1998, after the alleged attack on her. Ultimately, Dr. Weingarten concluded that Plaintiff's presentation and demeanor were not consistent with her reported symptoms. Other than Plaintiff's preoccupation with being mistreated by the police, Dr. Weingarten stated that Plaintiff presented no other notable psychological symptoms or problems, and he saw no evidence of a psychological process that would preclude Plaintiff from handling daily workplace demands, including interpersonal interactions. AR at 25.

The ALJ observed that Dr. Khoi, who examined Plaintiff in April 2003, described Plaintiff's difficulties as "characterological in nature," and not likely to affect her work, with the exception of a "mild" impairment in her interactive ability. AR at 26. The ALJ observed finally that Dr. Tobias found Plaintiff to be "relatively unimpaired" in her ability to perform work-related functions. AR at 27. The ALJ mentioned that Plaintiff's treatment for mental health issues was sporadic, that she had not sought treatment on her own, and that her case was eventually closed at Berkeley Mental Health due to non-contact. Id. According to the ALJ, the letter from Judy Radke, Plaintiff's caseworker at the Multi-Agency Service Center at Building Opportunities for Self-Sufficiency, stating that Plaintiff had difficulty relating to authority figures and that she had been kicked out of shelters "time and again," did not tell him anything new about Plaintiff's condition, when taken together with Dr. Tobias's diagnosis and Plaintiff's testimony at the hearing. AR at 29, 195.

Overall, the ALJ noted that "not one of those who have either examined or treated the claimant has ever stated or indicated that the claimant is unable to do work due to her mental health impairment." AR at 29. The ALJ pointed out that in fact, there are no records from 1998 showing that Plaintiff suffered from or received treatment for any of the symptoms stemming from her attack, something he "would not have expected were they as severe and disabling as claimant claims." AR at 30. He also noted that if Plaintiff were as impaired as she now claims by her "alleged anxiety, fatigue, insomnia, weight loss, and anorexia, among others, these would have been mentioned by those who treated her over the years" for her various physical complaints. Id. In addition, the ALJ pointed out that if Plaintiff truly were anorexic or suffering from the degree of weight loss that she claimed, she would have been described as other than "well developed" or "well nourished," and he

10

questioned why Plaintiff would continue working through 2001 if the symptoms that arose in 1998 were as disabling as she claimed. Id. Further, the ALJ did not find Plaintiff's activities of daily living, such as socializing, going out to eat, attending doctors' appointments, reading, and shopping/cooking to be consistent with her claims, which caused him to question her credibility. AR at 30-31. With regard to authority figures, the ALJ agreed that "the 1998 incident shows that this sort of problem does exist" but that it occurred only once and the following five years showed no recurrence. AR at 32. With regard to the claims of PTSD and Depression, the ALJ noted that neither of the two diagnoses had ever been confirmed. Id.

In conclusion, the ALJ determined that although Plaintiff does suffer from a personality disorder that causes her moderate to marked difficulty in social functioning, she would experience that more in certain social settings than in others, and there was nothing to suggest that she was precluded from doing all work, especially the type of work she used to do previously. AR at 32. The ALJ also recognized that Dr. Shapiro thought that Plaintiff might react poorly to supervisor instructions, but the ALJ saw insufficient evidence of that, especially in light of Plaintiff's testimony that she would react to an employer she did not like by hiding her feelings and continuing to do her job. Id.

Having made the RFC determination, the ALJ determined at step four of the evaluation process that Plaintiff was able to perform her past relevant work. AR at 32-33. Because Plaintiff had experience from prior jobs in doing the type of routine work that did not involve working closely with others or with the public, the ALJ found that Plaintiff would be able to perform all such jobs. Id. He noted that Plaintiff's earnings from past jobs may not have technically constituted "past relevant work" because her earnings did not meet the requirement for Substantial Gainful Activity ("SGA"). See 20 C.F.R. 4041565(a); 416.965(a)). However, the past work did demonstrate Plaintiff's ability to perform simple, unskilled jobs without too much interaction with others, and "since the Medical-Vocational Rules take administrative notice of simple, unskilled jobs such as these, it is appropriate to use these rules as framework in this case." AR at 33. In finding Plaintiff able to perform past relevant work, the ALJ therefore found her "not disabled" as defined by the SSA.

In the alternative, at step five, the ALJ applied Medical-Vocational Rule 204.00 as a framework to conclude that Plaintiff was "not disabled." Id. The ALJ therefore concluded that Plaintiff was not disabled and did not qualify for benefits. AR at 35.

**B. Review of the ALJ's Findings**

  **1. The ALJ's finding that Plaintiff did not meet Listing 12.08 is not supported by the record.**

The ALJ determined that Plaintiff's impairments, either alone or in combination, did not meet or equal Medical Listing 12.08, the only Listing that he found applicable in this case.[1] AR at 24. A personality disorder under that Listing exists "when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.08. For a claimant to show that her impairment meets a listing, "it must meet *all* of the specified medical criteria. An impairment that

---

[1] Medical Listing 12.08 (20 C.F.R. Pt. 404, Subpt. P, App. 1) states:

12.08 Personality Disorders: A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.

1. The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Deeply ingrained, maladaptive patterns of behavior associated with one of the following:

  1. Seclusiveness or autistic thinking; or

  2. Pathologically inappropriate suspiciousness or hostility; or

  3. Oddities of thought, perception, speech and behavior; or

  4. Persistent disturbances of mood or affect; or

  5. Pathological dependence, passivity, or aggressivity; or

  6. Intense and unstable interpersonal relationships and impulsive and damaging behavior;

  And

B. Resulting in at least two of the following:

  1. Marked restriction of activities of daily living; or

  2. Marked difficulties in maintaining social functioning; or

  3. Marked difficulties in maintaining concentration, persistence, or pace; or

  4. Repeated episodes of decompensation, each of extended duration.

1  manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley,
2  493 U.S. 521, 530 (1990) (emphasis in original). Further, for a claimant to show that her
3  impairment equals a listed impairment, "a claimant must establish symptoms, signs and laboratory
4  findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment,
5  or, if a claimant's impairment is *not* listed, then to the impairment 'most like' the claimant's
6  impairment." Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir. 1999) (emphasis in original).

7  Key to the ALJ's determination that Plaintiff did not meet or medically equal Listing 12.08
8  was the testimony of Dr. Shapiro. The ALJ stated in his opinion that Dr. Shapiro testified "that the
9  claimant did not meet or equal any of the listed impairments, in particular Listing 12.08 because she
10 did not satisfy the "B" criteria of the Listing." AR at 24. The ALJ further stated: "In [Dr. Shapiro's]
11 opinion, the claimant's activities of daily living were not impaired and he also indicated that her
12 concentration, persistence and pace were not a problem, i.e., no more than slightly impaired. Dr.
13 Shapiro did not feel that the claimant's ability to engage in social functioning was markedly
14 impaired. He did not find the 'repeated' episodes of decompensation that Listing 12.08 'B' would
15 require." Id.

16 The ALJ, however, misstated Dr. Shapiro's opinion. Dr. Shapiro actually testified that
17 although Plaintiff did not technically meet Listing 12.08, she equaled it. AR at 516. Further, Dr.
18 Shapiro testified that Plaintiff had a marked problem with difficulty in maintaining social
19 functioning and that Plaintiff would not be persistent in going to work, which satisfies the
20 equivalence requirement of the "B" portion of Listing 12.08. AR at 516-17. He further testified that
21 in his opinion, functioning in a shelter is like a minimal job, and that Plaintiff had a marked
22 difficulty in social functioning, as demonstrated by the fact that she had been kicked out of shelters
23 many times. AR at 521.

24 Defendant concedes that the ALJ misstated Dr. Shapiro's conclusion, but argues that the
25 misstatement was harmless because his decision that Plaintiff did not meet or equal Listing 12.08 is
26 supported by substantial evidence in the record. Opp'n at n. 3. Curry v. Sullivan, 925 F.2d 1127,
27 1131 (9th Cir. 1991) (the harmless error rule applies in social security cases). The record does
28 contain evidence that Plaintiff did not meet or equal the Listing. For example, Dr. Tobias

13

determined that Plaintiff had no impairment in her ability to maintain adequate pace or persistence. AR at 413. Dr. Weingarten determined that Plaintiff had "no impairment of pace, concentration or persistence," and concluded that "[b]ased on her current presentation, there is no evidence of a psychological process that would preclude her from dealing with typical workplace demands, including interpersonal interactions." AR at 235. Finally, Dr. Khoi concluded that: "From a strictly cognitive and emotional standpoint, the claimant is not likely to have difficulty performing adequately in the workplace. The claimant appears to have adequate ability to carry out simple job instructions, adapt to changes in a job routine, maintain adequate ability pace and persistence, and withstand the stress of a routine workday." AR at 396.

Yet the record also contains evidence supporting Dr. Shapiro's opinion and suggesting that the error was not harmless. For example, Dr. Tobias also found a moderate to marked level of impairment in Plaintiff's ability to get along with others, including the public, co-workers and supervisors. AR at 404. Moreover, Plaintiff is a poor reporter of her own functioning. Although the ALJ relied on Plaintiff's testimony that she would hide negative feelings about her employment, historically she has been unable to hold a job and regularly quit her positions because she was too "tired" to continue. AR at 497. Dr. Shapiro recognized that this behavior reflected a deeper inability to keep functioning on a job. AR at 517.

The question of whether the ALJ's error in reaching his conclusion that Plaintiff did not meet or equal Listing 12.08 was harmless or not is a close one. Because the Court has determined that it must remand on the remaining issues raised by Plaintiff as discussed below, the Court remands on this issue for the ALJ to correct its acknowledged error in accordance with this Order.

**2.     The ALJ erred in his determination at step four that Plaintiff is not disabled because she is able to perform past work.**

At step four, the claimant bears the burden of showing that she does not have the residual functional capacity to engage in past relevant work. 20 C.F.R. § 404.1520(e); <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1099 (9th Cir. 1999). A job qualifies as past relevant work only if it involves substantial gainful activity and if it lasted long enough for the claimant to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1); 404.1565(a). Substantial gainful activity is work done for pay or profit that

14

involves significant mental or physical activities. 20 C.F.R. §§ 404-1571; 404.1572. If a claimant can perform her past relevant work, then she is not disabled. If not, the ALJ moves to step five of the sequential analysis.

Plaintiff argues that the ALJ erred in finding at step four that Plaintiff could perform her past relevant work as a packager, mail sorter and hotel housekeeper. After examining all of the evidence, the ALJ determined that Plaintiff had the residual functional capacity to perform "relatively routine jobs where day-to-day instructions would not change." AR at 32. The ALJ found that her work experience consists primarily of these types of jobs that "are relatively routine, with little change in day-to-day job demands and involving no contact with the public and only minimal interaction with others." AR at 33. Based on Plaintiff's residual functional capacity, the ALJ concluded that she would be able to perform all such jobs involving relatively rote work. AR at 33.

The ALJ acknowledged that: "Although I have found the claimant able to perform the jobs she has performed in the past, I am aware that these jobs may not, technically, constitute her "past relevant work" because her earnings from this work may not have constituted SGA [substantial gainful activity]." AR at 33. The ALJ erred in finding that Plaintiff could perform her past relevant work without determining whether her earnings from that work constituted SGA, which is a primary part of the past relevant work determination. 20 C.F.R. § 404.1560 ("Past relevant work is work that you have done within the past 15 years that was substantial gainful activity, . . . ."); 20 C.F.R. § 404.1574 ("Generally, in evaluating your work activity for substantial gainful activity, our primary consideration will be the earnings you derive from the work activity."). Other factors to be analyzed to determine SGA include: (1) the nature of the work performed; (2) how well the claimant performs the work; (3) whether the work is done under special conditions; (4) whether the claimant is self-employed; and (5) the amount of time spent working. Acosta v. Apfel, 15 F. Supp. 2d 947, 950 (C.D. Cal. 1998). Although the ALJ briefly listed and detailed Plaintiff's past work (AR at 33), he did not make any findings on the remaining factors. Moreover, the ALJ did not analyze whether the temporary nature of Plaintiff's work and her earnings affected his finding that Plaintiff could perform past relevant work. See Lewis v. Apfel, 236 F.3d 503, 516 (9th Cir. 2001) (quoting Lester v. Chater, 81 F.3d 821, 833 (9th Cir. 1995)) (stating that the sporadic ability to work is not

15

inconsistent with disability). The ALJ also made no finding, as required in the definition of past relevant work, as to whether Plaintiff's jobs lasted long enough for her to learn to do them. 20 C.F.R. § 404.1560 ("Past relevant work is work that you have done within the past 15 years . . . that lasted long enough for you to learn to do it."). Finally, the ALJ failed to address whether Plaintiff's jobs lasting less than six months constituted SGA. See Soc. Sec. Ruling 84-25. To determine whether work lasting three to six months was SGA or an Unsuccessful Work Attempt ("UWA") under Ruling 84-25, the following factors are considered: (1) whether the work was reduced to the non-SGA level within six months due to the impairment; (2) whether there were frequent absences due to the impairment; (3) whether the work was unsatisfactory due to the impairment; and (4) whether the work was done during a period of temporary remission of the impairment. Id.

Plaintiff also argues that the ALJ erred in finding that Plaintiff could perform a broad category of jobs (those that are relatively routine), rather than a specific job or jobs that she did in the past. To the extent that the ALJ's finding is based on his determination that Plaintiff could do a broad category of jobs, it is in error. Vertigan v. Halter, 260 F.3d 1044, 1051 (9th Cir. 2001) ("'Finding that a claimant has the capacity to do past relevant work on the basis of a generic occupational classification of the work is likely to be fallacious and unsupportable.'") (quoting Soc. Sec. Ruling 82-61).

Because the ALJ did not undertake a proper examination of Plaintiff's claim at step four, this case is remanded for the ALJ to make a determination as to Plaintiff's ability to perform past relevant work.

### 3. The ALJ erred in his determination at step five that Plaintiff is able to perform other work based solely on the medical-vocational guidelines.

At step five, the burden shifts from the claimant to the Secretary to show that the claimant was not disabled because she could perform other work in the national economy. There are two ways that the Secretary can make that showing: (1) by taking the testimony of a vocational expert; and (2) by using the Medical-Vocational guidelines. Use of the Medical-Vocational guidelines may not be appropriate where a claimant has significant non-exertional impairments. See Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988) ("But where, as here, a claimant's nonexertional

1    limitations [severe psychiatric impairments] are in themselves enough to limit his range of work, the
2    [medical-vocational] grids do not apply, and the testimony of a vocational expert is required to
3    identify specific jobs within the claimant's abilities."); 20 C.F.R. Part 404, Subpart P, App. 2
4    (Medical-Vocational Guidelines) ("Since the rules are predicated on an individual's having an
5    impairment which manifests itself by limitations in meeting the strength requirements of jobs, they
6    may not be fully applicable where the nature of an individual's impairment does not result in such
7    limitations, e.g., certain mental . . . impairments."). Further, an ALJ may use the Medical-
8    Vocational guidelines in lieu of taking the testimony of a vocational expert "only when the grids
9    accurately and completely describe the claimant's abilities and limitations." Jones v. Heckler, 760
10   F.2d 993, 998 (9th Cir. 1985) (citing Heckler v. Campbell, 461 U.S. 458, 462 (1983)); Bellamy v.
11   Secretary of Health & Human Servs., 755 F.2d 1380, 1383 (9th Cir. 1985) ("The record here reveals
12   several significant non-exertional impairments (pain, nausea, dizziness and fainting) that precluded
13   sole reliance of the grids.") (emphasis added); see also Desrosiers v. Secretary of Health & Human
14   Servs., 846 F.2d 573, 577 (9th Cir. 1988) (Pregerson, J., concurring) ("The grids may be used as a
15   *reference point* for decisionmaking when they do not accurately and completely describe a
16   claimant's residual functional capacity, age, education, or work experience. However, under those
17   circumstances, 'the Secretary may not rely on the grids alone to show the availability of jobs for the
18   claimant.' The Secretary must *also* hear the testimony of a vocational expert.") (quoting Jones, 760
19   F.2d at 998; citing Permitter v. Heckler, 765 F.2d 870, 872 (9th Cir. 1985)) (emphasis in original).

20          Here, in the alternative to his finding at step four, the ALJ determined that, using the
21   Medical-Vocational Guidelines as a framework, Plaintiff was not disabled. AR at 33. The ALJ
22   stated: "Since the Medical-Vocational rules take administrative notice of simple, unskilled jobs such
23   as these, it is appropriate to use these rules as framework in this case, And given the claimant's lack
24   of any exertional functional limitations, Medical-Vocational rule 204.00, when used as a framework,
25   would be the rule that applies." AR at 33. Rule 204.00 states in relevant part:

26   Individuals ordinarily will not have a severe impairment or will be able to do
their past work – either of which would have already provided a basis for a
27   decision of "not disabled." . . . Thus an impairment which does not preclude
heavy work (or very heavy work) would not ordinarily be the primary reasons for
28   unemployment, and generally is sufficient for a finding of not disabled, even
though age, education and skill level of prior work experience may be considered

17

adverse.

20 C.F.R. Part 404, Subpart P, Appendix 2, § 204.00.

Where, as here, a claimant has only a nonexertional type of impairment, "determination as to whether disability exists shall be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in this Appendix 2. The rules do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional types of impairments." 20 C.F.R. Part 404, Subpart P, App.2 § 200.00(e)(1); see also Soc. Sec. Ruling 85-15 (mental impairments are generally considered to be nonexertional). Social Security Ruling 85-15 also states: "Where there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work. . . . However, persons with this large job base may be found disabled because of adversities in age, education and work experience." Here, even though the ALJ said he was using the guidelines as a framework, he actually relied solely on those guidelines to conclude that Plaintiff was not disabled without taking into account whether her age, education or work experience weighed against that conclusion.

The ALJ did not err in using the grids as a *framework* for finding that Plaintiff was not disabled, but the grids do not completely and accurately describe Plaintiff's limitations because she has no exertional limitations. The grids do not take nonexertional limitations into account and therefore cannot be used, as they were here, as the sole basis for an alternative finding that Plaintiff was not disabled. On remand, if the ALJ reaches step five, he should make a determination at the step in accordance with this Order.

**V.     CONCLUSION**

Plaintiff's motion for summary judgment is granted and the case is remanded to the ALJ for further proceedings in accordance with this Order. Defendant's cross-motion for summary judgment is denied.

18

**United States District Court**
For the Northern District of California

1 **IT IS SO ORDERED.**

2 Dated:  February 13, 2006

_____
ELIZABETH D. LAPORTE
United States Magistrate Judge